Raffi SOGHOMONIAN and Deborah Garabedian, Plaintiffs,

v.

THE UNITED STATES of America, the Internal Revenue Service, Fidelity National Title Insurance Company, Trans Union LLC, and Does 1–50, inclusive, Defendants.

No. CV F 99–5773 AWU DKB.

United States District Court,
E.D. California.

July 29, 2003.

Stephen Roy Cornwell, Cornwell and Sample, Fresno, CA, for Raffi Soghomonian, Deborah Garabedian, plaintiffs.

Michael J Desmond, United States Department of Justice, Tax Division, Wash-

ington, DC, for Internal Revenue Service, defendant.

Margery Q Lee, Fidelity National Title, Insurance Company, Legal Division, Walnut Creek, Brian P Stewart, Law Offices of Mark Schiffman, Irvine, CA, for Fidelity Nat. Title Ins. Co. of Cal., defendant.

Brian M Russ, Crowell and Moring, Irvine, for Trans Union Corporation, defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ISHII, District Judge.

In this case, plaintiffs are Raffi Soghomonian ("Raffi") and Deborah Garabedian ("Deborah") (collectively "Plaintiffs"). They have sued defendants the United States and the Internal Revenue Service ("IRS"), Fidelity National Title Insurance Company ("Fidelity"), and Trans Union LLC ("Trans Union") (collectively "Defendants").

The only remaining defendant in this action, Trans Union, has moved for summary judgment on the only remaining claim—Plaintiff's eighth claim for relief against Trans Union under the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. section 1681 *et seq.* Hearing on Trans Union's motion was previously set for June 9, 2003. By order filed June 3, 2003, the court vacated the hearing on Trans Union's motion for summary judgment and took the matter under submission as of that date. *See* L.R. 78–230(h).

For the reasons set forth below the court now issues this order denying Trans Union's motion in its entirety.[1]

## DISCUSSION

The facts and procedural background of this case, as well as the parties' arguments in connection with the present motion, are well known to the parties and to the court. They will therefore not be recited here except as necessary to rule on the present motion.

The following issues are discussed in the same order as presented in Trans Union's moving papers.

### I. Negligent Violation of the FCRA

Trans Union's argument that it cannot be held liable for negligent violation of the FCRA is rejected.

Trans Union's assertion that it cannot be held liable on a theory of negligent FCRA violation is based on two main contentions, each of which contains several sub-arguments. These main arguments are discussed separately below.

### A. Failure to investigate tax liens

■ Trans Union's first main argument (or set of arguments) centers upon Trans Union's alleged failure to adequately and nonnegligently investigate the status of the tax liens which had been imposed upon the property of Raffi.

Trans Union contends, first, that it complied with the requirement that it follow "reasonable procedures" with respect to the status of these tax liens as set forth in the caselaw interpreting the FCRA because (1) Plaintiffs submitted only one notice of dispute to Trans Union regarding the tax liens, and this notice of dispute "referenced, but did not identify by number," the Certificates of Non–Attachment of Federal Tax Liens ("CNAs") issued by

---

1. Although the court denies Trans Union's motion for summary judgment, this does not mean that Trans Union will obtain no relief whatsoever. Instead, the court will find below that as to certain claims that are *arguably* contained in the complaint, these claims ei-

ther fail to state a valid basis for recovery or are not sufficiently pleaded to allow Plaintiffs to proceed to trial. Thus, if nothing else, by the present order the court will narrow to some extent the issues that remain for trial of this matter.

the IRS which pertained to these tax liens; (2) in investigating this dispute Trans Union "faced an unusually complex and difficult task" because the documents Plaintiffs provided Trans Union to prove that the tax liens were invalid, the CNAs just mentioned, appeared to be "informal and unofficial," lacked a "seal or recording information," and were, in Trans Union's words, "extremely rare" and unknown to the company that Trans Union relied upon to conduct the reinvestigation of the status of the tax debt; (3) any confusion in this case is largely attributable to the IRS itself inasmuch as the IRS issued *three different sets* of notices of federal tax liens with respect to the subject property, all based on the same underlying tax liabilities; (4) related to the argument numbered (2), above, the CNAs were unknown to the company that Trans Union relied upon to verify the status of the tax debt, and this company "simply did not know to look for them";

and (5) eventually—indeed, only "a few months after" receiving Plaintiffs' statement of dispute regarding the tax liens— Trans Union was able to "confirm the status" of the tax liens with an IRS representative named Frank Guido, and thereafter permanently removed the tax liens from Raffi's credit report.[2] In addition, Trans Union claims that even if some of the tax liens had been extinguished by the CNAs, it is undisputed that other tax liens remained on the subject properties for which the IRS *had not* issued CNAs. Therefore, Trans Union argues, the information contained in the credit reports was substantially accurate: the dollar amounts associated with the tax liens were correct, and the only inaccuracies concerned the dates of the liens' issuance and the serial numbers of the liens themselves. In these circumstances, Trans Union asserts that "it was impressive that Trans Union was able to resolve plaintiffs' dispute as quickly

**2.** Trans Union's fifth argument as set forth in text above refers only to the credit report of Raffi, as opposed to Deborah. One of Trans Union's theories in moving for summary judgment is that Deborah lacks standing to pursue recovery for the allegedly improper conduct at issue here because (1) she is Raffi's wife; (2) the portions of Raffi's credit reports currently under discussion did not make specific reference to Deborah; and (3) persons not specifically mentioned in a credit report, and who themselves do not complain of inaccurate reporting of their information (as opposed to the information of a spouse), lack standing to pursue recovery under the FCRA. This argument, as formulated by Trans Union, falls under the general heading of "spousal standing."

It is not entirely clear whether Plaintiffs contend that any inaccurate information was reported in a credit report belonging to Deborah personally, as opposed to Raffi. At times Plaintiffs appear to assert that Deborah's credit reports also contained erroneous information which can form the basis for recovery against Trans Union; at other times they appear to concede that it is only Raffi's report that is at issue here. What is clear, however,

is that Plaintiffs *do* contend that they are entitled to recovery so far as Deborah is concerned based on the inaccurate information contained in Raffi's report because certain *joint* credit accounts are mentioned there, and the denial of credit due to the incorrect reporting injured both Deborah and Raffi equally. In other words, Plaintiffs argue that even if the credit report at issue did not bear Deborah's name, it nevertheless had a very real and disadvantageous effect upon her as well as upon her husband.

The court will ultimately agree with this argument in the materials that follow, and will conclude that Deborah does indeed have standing to seek recovery under the FCRA in this case. Therefore, it appears to make little if any difference whether this order refers to the credit report that is primarily at issue in this case—Raffi's—in the singular or in the plural, or whether the court refers to it as Deborah's or Raffi's (or both). Therefore, the reader of this order should not place any special significance on any reference in the text above to the credit *report* or *reports* of Plaintiffs (or of either of them individually), as these terms will be used somewhat interchangeably here.

as it did." The court rejects each of these arguments.

Under the FCRA, a credit reporting agency is required to maintain reasonable procedures to assure the accuracy of information it disseminates, both with respect to the information contained in credit reports generally and with respect to the reinvestigation the agency is required to perform if a consumer disputes the contents of a report. *See* 15 U.S.C. §§ 1681e(b), 1681i; *see also Thomas v. Trans Union LLC,* 197 F.Supp.2d 1233, 1237–38 (D.Or.2002) (citations and quotations omitted). Based on the contents of Plaintiffs' currently-operative pleading—their first amended complaint—it appears that Plaintiffs' primary theory in this case, at least so far as negligence is concerned, is not that Trans Union failed to maintain reasonable procedures to prevent the *appearance* of incorrect information on their credit reports in the first place, but that Trans Union failed to take adequate steps after receiving Plaintiffs' statement of dispute.

As can be seen from the summary of Trans Union's arguments set forth in the previous paragraph, Trans Union's main defense in this case is one of "reasonableness"; Trans Union contends that it acted reasonably in its handling of Plaintiffs' dispute, particularly in light of the allegedly unusual—indeed, almost unheard of according to Trans Union—nature and physical appearance of the CNAs that Plaintiffs provided as proof that the tax debts were not theirs. In addition, Trans Union appears to contend that it should not be held liable for continuing to report the tax liens as unsatisfied after receiving Plaintiffs' notice of dispute because the CNAs were unknown to the company it depended upon to verify disputed information of this type, Hogan Information Services ("Hogan").

To the extent that Trans Union's argument is that it should not be held liable for the continuing appearance of the tax liens after Plaintiffs submitted a notice of dispute because Hogan was unfamiliar with CNAs, this argument is contrary to clearly established law. In order for this argument to prevail, Trans Union would have to establish that its reliance on Hogan was itself reasonable; if it was not reasonable, then Trans Union cannot be said to have used reasonable procedures to assure the accuracy of the information it continued to disseminate even after receiving notice of Plaintiffs' dispute. However, the caselaw is clear that a credit reporting agency does *not* act reasonably under the FCRA by deferring entirely to another source of information. The "grave responsibility" imposed by the FCRA's reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3d Cir. 1997) (quotations and brackets omitted). This is be especially true where, as here, the source which the reporting agency relies upon *does not* consider information supplied by the consumers in the course of "verifying" the disputed information. Moreover, as the Ninth Circuit has stated, the reasonableness of a credit reporting agency's procedures under the FCRA and whether the agency actually followed these procedures "will be jury questions in the overwhelming majority of cases." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995) (citation omitted). In this case, Plaintiffs not only submitted a statement of dispute with respect to the tax lien information, but *they also provided proof to Trans Union that the tax liens had been extinguished.* This proof came from the IRS itself in the form of the CNAs that Plaintiffs provided to Trans Union directly. Plaintiffs' act of providing copies of the CNAs to Trans Union went well beyond what was re-

quired of them under the FCRA; all that was required of them was that they notify Trans Union that they disputed the contents of their credit report, and Trans Union was required to perform a free reinvestigation of the disputed items and "record the current status of the disputed information, or delete the item[s] from the file," within 30 days of the date of Plaintiffs' dispute. 15 U.S.C. § 1681i(a)(1)(A). By providing Trans Union evidence that the tax debt was not valid at the same time they submitted their statement of dispute, Plaintiffs did all they could to ensure that Trans Union would comply with its duties under the FCRA. Yet Trans Union did not comply; it continued to report the tax liens as valid, even though they were not. In this case, a reasonable jury could well conclude that the measures taken by Trans Union were not sufficiently "reasonable" under the circumstances to excuse Trans Union from liability for failure to adequately respond to Plaintiffs' statement of dispute.[3]

■ Trans Union's next main contention that even if the tax lien information it reported was technically incorrect, it was not incorrect in any *material* way because at the time Trans Union wrongfully reported the tax liens as unsatisfied even though they actually were satisfied, there were *other* tax liens in the same amounts

and concerning the same properties which had not been "nonattached" by the IRS. In other words, as the court understands Trans Union's argument, the fact that Trans Union continued to misreport the status of Plaintiffs' tax debt was basically immaterial, because there undisputedly were other tax liens which were identical except for the issuance date and the identification numbers. The court rejects this argument. Under federal law, a CNA cannot issue unless the IRS is satisfied that "because of confusion of names or otherwise, any person (other than the person against whom the tax was assessed) is or may be injured by the appearance that a notice of lien." 26 U.S.C. § 6325(e). *The filing of a CNA in the office in which the lien was initially filed operates to establish "conclusive[ly] that the lien of the United States does not attach to the property of the person referred to in [the tax lien]."* 26 U.S.C. § 6325(f)(1)(D) (emphasis added). Here, the tax liens at issue were initially filed in the Fresno County Recorder's Office. This fact is apparently not disputed by any party. Later, upon the issuance of the CNAs, Plaintiffs recorded the CNAs with the same office— i.e., the Fresno County Recorder's Office. This fact is also undisputed. Under section 6325(f)(1)(D), then, the CNAs demonstrated *conclusively* "that the lien of the

---

**3.** As already suggested, none of this is changed by the fact that Trans Union supposedly relied upon Hogan to verify the status of the tax liens. There is no FCRA exception to the reinvestigation requirement that automatically excuses a credit reporting agency from liability simply because the agency relies upon some other company to do the very thing the agency is required by law to do— i.e., reinvestigate and verify the status of the disputed information. Furthermore, the evidence in this case suggests that Trans Union did not even bother to provide a copy of the CNAs to Hogan when it asked Hogan to investigate and verify. If Trans Union had provided a copy of the CNAs to Hogan, Trans

Union's alleged reliance on Hogan's "verification" *might* have been more reasonable, or at least less unreasonable. As it is, however, it appears that Trans Union did *literally nothing* to verify the status of the tax liens other than to ask Hogan to do so. And it appears that Hogan did literally nothing to verify the status of the liens, at least so far as the CNAs were concerned, other than to report the debts as verified.

Under these circumstances it can hardly be said that Trans Union performed a reinvestigation that was reasonable as a matter of law, regardless of who Trans Union *now* contends should have performed the reinvestigation— i.e., Trans Union or Hogan.

United States does not attach to the property of the person referred to" in the tax lien—i.e., the property of Raffi. In other words, Raffi's property was freed from *all tax liens that had been issued with respect to that property.* For Trans Union to contend, as it does now, that its inaccurate reporting of nonattached liens was essentially harmless because there were other valid liens in the same amounts in effect at that time is therefore directly contrary to federal tax law. *All* property listed in the CNAs was released from the liens, and the other liens that Trans Union now relies upon were themselves no longer in existence so far as Raffi was concerned.

██ If the foregoing facts were not enough—i.e., if the CNAs plus Plaintiffs' statement of dispute were not sufficient to put Trans Union on notice that the tax liens no longer existed and therefore should not have been reported—there are two other facts which in this court's view should have permitted Trans Union to perform a more complete investigation and determine that the liens had been removed. These two other fact are as follows. First, the CNA itself states that the tax liens based on the 1990 and 1991 tax years "did not attach, and do[ ] not now attach, to *any* separate property of Raffi K. Soghomonian." (Russ Decl. Ex. A at 11, 15 (emphasis added).) This language— i.e., that the CNA eliminated the tax lien for *any* of Raffi's property—should have

been sufficient to put Trans Union on notice that the liens were eliminated and should not have been reported, even if Hogan had "confirmed" their existence. Second, the statement of dispute included with it a telephone number for Frank Guido, along with a notation stating Guido would verify that the tax liens had been nonattached. (Soghomonian Decl Ex. N at 1.)[4] It appears that neither Trans Union nor Hogan made any reasonable effort whatsoever, at least at this point in time, to verify with Guido that the tax liens did or did not exist. This failure to verify the status of the tax liens in spite of being provided with very specific contact information to assist in doing so further suggests that Trans Union's investigation in this matter was not reasonable under the circumstances.

██ To summarize: the CNAs effectively nonattached *all* of the liens upon Raffi's property; Trans Union was specifically informed of this fact in unambiguous terms; and yet Trans Union failed to change the way in which it reported the liens on Plaintiffs' credit report, and failed to so much as provide a copy of the CNAs to Hogan to assist in its reinvestigation of the status of the tax debt. In these circumstances, a reasonable jury could find that Trans Union unreasonably failed to respond to Plaintiffs' statement of dispute. The court is therefore unable to grant summary judgment to Trans Union.[5]

---

4. Trans Union objects to this evidence as irrelevant; however, it is highly relevant, as it tends to show not only that Trans Union *could* have investigated the status of the tax debts more carefully and completely, but that it had been provided the very information that would have assisted in performing such an investigation.

5. The discussion in text above has so far focused on whether Trans Union can be held liable for negligent violation of the FCRA based on Trans Union's alleged failure to perform an adequate investigation of the status of

the tax liens after being specifically asked to do so by Plaintiffs. A separate issue, which the parties have touched upon only briefly in their papers, is whether Trans Union can be liable for the related alleged FCRA violation of failing to notify potential creditors of Plaintiffs who had received inaccurate information from Trans Union in the past that the information was incorrect. *See* 15 U.S.C. § 1681i(d). Trans Union contends that it cannot be held liable on any such theory because Deborah herself insisted that Trans Union *not* notify any such creditors of the results of its reinvestigation or send corrected

## B. Damages

Trans Union's next argument is that regardless of whether it was negligent in its handling of Plaintiffs' dispute, Plaintiffs cannot establish that they suffered any damages as a result. First, Trans Union states that Plaintiffs "have not even alleged that they were denied credit" during the time between the filing of their statement of dispute and the date upon which the tax liens were permanently removed from the credit reports—a period of perhaps five months according to Trans Union, or an "extremely brief time period." In the absence of a denial of credit, Trans Union appears to argue, there can be no recovery under the FCRA. Second, Trans Union argues that even if the tax liens were incorrectly reported, there were other, still valid tax liens that existed at that time against Raffi, and the inaccuracies contained in the credit reports were therefore "immaterial." The court rejects both of these arguments.

Regarding the "materiality" of the contents of the credit reports, the court has already observed that a CNA operates to extinguish the government's lien upon "the property of the person referred to"—i.e., the property of Raffi. Thus, as a matter of federal law, a single CNA with respect to a property would operate to eliminate *all* tax liens upon that property. At least this would appear to be true absent some unusual circumstance such as tax liens imposed by different taxing authorities, or different tax debtors who are co-owners of the same property (neither of which circumstances is alleged to exist here). Moreover, *the CNAs themselves indicated that the government's tax liens do not and did not attach to any property of Raffi.* This should have been sufficient to put Trans Union on notice that *all* tax liens against the property had been eliminated, and it forecloses Trans Union's argument that the error in reporting was immaterial because there were other tax liens that it could have reported anyway if it had wanted to.

■ The argument that Plaintiffs have failed to allege a denial of credit, and (apparently) that Plaintiffs therefore cannot demonstrate the existence of any damages "as a result" of the reporting of the tax liens, is contrary to the law of the Ninth Circuit. The Ninth Circuit has clearly stated that an FCRA violation "is actionable even absent a denial of credit," and "no case has ever held that a denial of credit is a prerequisite to recovery under the FCRA." *Guimond,* 45 F.3d at 1333. If

---

credit reports. For their part, Plaintiffs contend just the opposite; they state that they specifically requested that corrected reports be sent out.

The court finds that Plaintiffs may proceed on their section 1681i(d) failure-to-correct (or, perhaps more accurately, failure-to-notify) theory. Trans Union acknowledges in its moving papers that "plaintiffs dispute [the] account" of the Trans Union employee who was supposedly asked by Deborah not to send out corrected copies of the credit report. Moreover, Plaintiffs' statement of dispute asking Trans Union to investigate and correct the credit report specifically requested that Trans Union "correct promptly and forward proof of correction to [Deborah's] address *and to any subscriber of information within the past*

*four months.*" (Russ Decl. Ex. A at 8 (emphasis added).) From this it would appear that there is, at a minimum, a disputed issue of fact whether Plaintiffs asked Trans Union *not to* send out corrected reports or whether they asked that Trans Union do just the opposite—i.e., whether they asked Trans Union *to* send out corrected reports. Accordingly, the court concludes that to the extent one of Plaintiffs' theories of recovery is a section 1681i(d) failure to correct or notify—and this is one of Plaintiffs' theories of recovery, (*see* First Am. Compl. at 77:19–28)—Plaintiffs must be allowed to proceed to trial on this theory. Insofar as Trans Union's motion seeks judgment as to this ground for recovery, Trans Union's motion is denied.

nothing else, it is possible that Plaintiffs could prove that they suffered "emotional distress and humiliation," *id.* (citations omitted), and it would therefore be error for this court to enter judgment in favor of Trans Union based on Plaintiff's supposed failure to offer any evidence that they suffered economic or pecuniary damages as a result of Trans Union's conduct.[6]

## II. Willful Violation of the FCRA

■ Trans Union next contends that even if it can be held liable for negligent violation of the FCRA, it cannot be held liable on a willful violation theory because (1) Trans Union performed a "good faith investigation" in response to Plaintiffs' statement of dispute, and eventually removed the tax liens from Plaintiffs' credit report in spite of the "enormous complexity" created by the multiple tax liens and the "rare" CNAs; (2) the true reason for any delay in removing the tax liens from Plaintiffs' credit report was Hogan's lack of familiarity with CNA's, and this is not indicative of bad faith; and (3) there was "so much uncertainty" regarding whether the tax liens (or CNAs) were valid that "any finding of willful misconduct is precluded as a matter of law." The court disagrees.

The foregoing three arguments can be boiled down to one simple contention: that the tax liens and CNAs were unusual and difficult to understand, and Trans Union therefore did not act willfully when it took months to delete them from Plaintiffs'

credit reports. The court finds that the premise upon which this argument rests— that the tax liens and CNAs were "complex" and "rare"—is flawed, and that the conclusion Trans Union reaches does not follow from the premise in any event.

The CNAs were not complex at all. As is relevant here, they stated that (1) the person issuing the CNA is a duly authorized IRS representative; (2) the tax liens associated with Soghomonian Farms and certain other individuals and entities of the same last name "did not attach, and do[ ] not attach, to any separate property of [Raffi]"; (3) the tax liens also did not and do not attach to a certain parcel of property located on Belmont Avenue in Sanger, California; (4) a lien was previously filed in a certain amount and with a certain number, as provided by law; and (5) the "reason for this action [the issuance of the CNA] is that it has been determined that Raffi Soghomonian, is not liable for tax under the above assessment." (Russ Decl. Ex. A at 11, 15.) The CNA was then signed by the issuing IRS official. Trans Union fails to explain to the court's satisfaction what was so "complex" about this language as to preclude a finding that Trans Union was acting "willfully" when it failed to delete the derogatory entries on Plaintiffs' credit reports for a period of months *after Plaintiffs provided Trans Union with copies of these documents.*

Moreover, as already observed, the CNAs were themselves accompanied by

---

**6.** By this comment, the court does not mean to suggest that Plaintiffs have no evidence of financial damages, or that they will be unable to prove the existence of such damages at trial. Indeed, Plaintiffs *have* offered evidence that they have suffered damages in the form of (among other things) their inability to qualify for mortgages during this approximate time period, and for Trans Union to suggest otherwise is disingenuous. (*See, e.g.,* Soghomonian Decl. Ex. R, and accompanying declaration.)

Trans Union again objects to this evidence as irrelevant, and as hearsay. However, it clearly is relevant, as it tends to make a fact in dispute (i.e., the existence of damages) either more or less likely. *See* Fed.R.Evid. 402. It probably does not constitute hearsay either, because the denial letters upon which Plaintiffs rely appear to be business records, and Raffi is free in any event to testify to Plaintiffs' inability to obtain financing without relying on any out-of-court statements. Trans Union's objections are therefore overruled.

Plaintiffs' statement of dispute, which in turn told Trans Union exactly how it could verify with the IRS that the tax liens had in fact been nonattached—i.e., by calling Frank Guido at the telephone number provided in the statement of dispute. (*See id.* at 7.) Under the FCRA, where a consumer provides "relevant information" in connection with the statement of dispute the credit reporting agency is required to "review and consider" such information in performing its reinvestigation of the item in dispute. 15 U.S.C. § 1681i(a)(4). Because the section just quoted refers to the FCRA subsection which contains the 30–day reinvestigation requirement,[7] it appears that in most cases at least, the credit reporting agency must not only consider any "relevant information," but must consider it within 30 days *at the most* of the date of receiving it. Here, it appears that Trans Union did not perform *its own* investigation or review of the CNAs Plaintiffs supplied in connection with their statement of dispute, at least not within 30 days of receiving it; Trans Union does not claim to have done so, and instead states that it "directed Hogan . . . to verify the status of the liens." (Mot. at 5:9–10.) Hogan, however, also apparently failed to check the status of the CNAs; Trans Union states that Hogan "apparently did not look for Certificates of Non–Attachments [sic] in its investigation of the disputed [tax liens]." (Def.'s Sep. Stmt. Undisp. Facts at 7:6–8.) Thus, it appears that *nobody* conducted a sufficient review of the facts upon which the tax lien portion of the credit report was based, notwithstanding the fact that Plaintiffs supplied Trans Union the very information it *arguably* might have needed to do so. All this was contrary to FCRA. In this circumstance, the fact that Trans Union took literally months to delete the tax lien entries on Plaintiffs' credit report could well lead a reasonable jury to conclude that Trans Union's actions were willful; Trans Union's justifications for not acting sooner simply are not persuasive, or a reasonable jury could so believe.

There is another reason why the court finds that a reasonable jury could conclude that Trans Union's violation of the FCRA in this case—assuming the jury finds that the FCRA was in fact violated—was "willful": the timing of Trans Union's *eventual* removal of the tax liens from Plaintiffs' credit report. As one might imagine, Plaintiffs became increasingly frustrated over time with the fact that the tax liens continued to appear on their credit reports, and they eventually filed a small claims court action against Trans Union for its alleged mishandling of their credit reports. At one point the hearing on Plaintiffs' small claims matter was scheduled for July 19, 1999. (*See* Russ Decl. Ex. B at 79.) As the hearing on the small claims action approached, and possibly at the direction of the Trans Union employee who would have appeared in small claims court on that case, another Trans Union employee sent a document referred to in Plaintiffs' papers as the "eight page fax" to Guido of the IRS, requesting that Guido "review [the] documents" and determine if

---

7. Under the FCRA, a credit reporting agency that receives a statement of dispute from a consumer is generally required to perform a reinvestigation and verification of the disputed item—and if the information cannot be verified, to delete the item—within 30 days of the consumer's notification of dispute. *See* 15 U.S.C. § 1681i(a)(1)(A). An extension may be granted if the agency "receives information from the consumer during that 30–day period that is relevant to the reinvestigation," 15 U.S.C. section 1681i(a)(1)(B); however, such an extension cannot exceed 15 days. Here, even if Trans Union was entitled to a 15–day extension, its completion of its reinvestigation and ultimate deletion of the tax lien information from Plaintiffs' credit report took substantially longer than was allowed by law—some four to five months according to the evidence.

the liens were "filed in error." (*Id.* Ex. C at 8.) The Trans Union employee who would have appeared at the small claims action also communicated directly with Guido regarding the status of the liens. Plaintiffs subsequently dismissed their small court action, and filed the present suit instead. For present purposes, however, the important fact is this: it was only *after* Trans Union had been sued and the hearing date was approaching that Trans Union actually investigated for itself the true status of the tax liens. And, accepting the chronology of events advanced by Trans Union in its moving papers, no more than a few days after it had so investigated, the tax liens were removed from Plaintiffs' credit report. In other words, it was not until the threat of litigation loomed over Trans Union—and, indeed, until litigation was imminently pending—that Trans Union complied with its statutory duty of fully investigating the status of the tax liens. This was true notwithstanding the fact that Plaintiffs had themselves supplied Trans Union with all the documents it might have needed to determine the

invalidity of the liens. Indeed, one of the CNAs appears to have been a part of what Plaintiffs characterize as the "eight page fax"—meaning that Trans Union relied upon the very information in preparing to defend itself in litigation that it refused to consider upon Plaintiffs' request, notwithstanding the clear mandate of the FCRA.[8]

Based on the foregoing, a jury might well find that Trans Union was perfectly capable all along of examining the CNAs and consulting with the IRS, and was also fully able to determine that the tax liens were invalid. Support for such a finding would come from the fact that Trans Union did exactly this—i.e., investigate the liens and then delete them—when pressed by litigation to do so. Indeed, in its reply papers, Trans Union admits that its ultimate removal of the liens from Plaintiffs' credit report occurred "as a direct result of" the communication between Guido and the Trans Union employee who would have appeared at the small claims court hearing. In this circumstance a jury might conclude that Trans Union was acting in willful violation—or at least willful disregard—of its statutory duties when it processed Plaintiffs' statement of dispute.[9]

8. One might have expected Trans Union to object to the evidence referred to in the foregoing paragraph. At least as to most of it, however, it did not. Of course, most of the facts set forth above come from evidence submitted by Trans Union, and the remainder of these facts come from the Plaintiffs' own separate statement of disputed facts submitted in opposition to Trans Union's motion for summary judgment—which in turn is based in considerable part on evidence provided by Trans Union or on the testimony of Trans Union's own witnesses. As to Plaintiffs' separate statement of undisputed facts, Trans Union has not filed a response. Thus, the court concludes that for present purposes at least, the foregoing facts are without substantial dispute.

Even if these facts were in dispute, however, under the well-established principle that the court is required to credit the evidence of the nonmovant (Plaintiffs here), the court would still conclude that the evidence set

forth in the text above is sufficient to preclude entry of judgment in favor of Trans Union at this time.

9. There is appears to be no Ninth Circuit caselaw addressing the issue of the precise definition of "willful" as that term is used in the FCRA, and little (if any) published district court authority from within the Ninth Circuit that is *directly* on point. One case Plaintiffs rely on, *Mathews v. Gov't Employees Ins. Co.,* 23 F.Supp.2d 1160 (S.D.Cal.1998), considers the definition of "willful" under the FCRA, but arguably for a different purpose—i.e., for the purpose of determining whether a defendant may required to pay punitive damages.

In any event, Trans Union here appears to concede that liability for "willfully" violating the FCRA may be imposed based on a credit reporting agency's "*reckless* [ ] or ... *conscious disregard* of plaintiff's rights," (Reply at 13 n. 10 (citation omitted, emphasis original)), and Plaintiffs argue for a substantially similar definition in their opposition papers.

### III. Section 1681f "Excessive Disclosure" Claim

█ Trans Union's next argument is that it cannot be held liable under the FCRA for making unauthorized disclosures to the IRS of consumer information other than "identifying information" as permitted by the statute. 15 U.S.C. § 1681f. Under the FCRA, a credit reporting agency "may furnish identifying information respecting any consumer, limited to his name, address, former addresses, places of employment, or former places of employment." *Id.* Although this section does not purport to authorize an action for damages, elsewhere the FCRA provides in general terms for the imposition of civil liability for negligent or willful violations of its provisions. *See* 15 U.S.C. §§ 1681n, 1681o. One of the theories of recovery set forth in Plaintiffs' complaint is that Trans Union "provid[ed] information to a governmental entity, the IRS, in excess of a name, address, former address, and place of employment." This occurred, according to Plaintiffs, on two occasions: (1) when the Trans Union employee mentioned above sent the "eight page fax" to Guido of the IRS; and (2) when the employee who would have represented Trans Union in the small claims hearing spoke to Guido about the status of the liens.

Trans Union makes the following discernible (but in some cases brief) arguments in support of its more general contention that it cannot be held liable under section 1681f for unauthorized disclosures to the IRS.

First, Trans Union asserts that the language of section 1681f "is phrased *permissively*." Trans Union states that this section "provides that a consumer reporting agency '*may* furnish identifying information respecting any consumer, limited to his name, address, former addresses, places of employments, or former places of employment, to a governmental agency.'" (Mot. at 20:22–25 (emphasis added).) By this Trans Union appears to argue that there is no requirement in section 1681f that it not refrain from disclosing identifying information to government agencies, because the word "may" appears near the beginning of the passage just quoted. In addition, Trans Union may be contending that even if it was not permitted under section 1681f to disclose "identifying information," the only information which can qualify as "identifying" under the statute is information relating to the consumer's physical characteristics, ethnicity, and the like. Trans Union argues that "[b]y its express terms, the statute applies only to 'identifying information,' *i.e.,* the disclosure of information (other than that expressly permitted) that would 'identify' the consumer, *e.g.,* physical characteristics, ethnicity, etc." (Mot. at 20:25–29.) This appears to be a contention that the term "identifying" as used in the FCRA should mean only information such race or physical characteristics, and because Trans Union did not disclose any such information to the IRS, it cannot be held liable. Trans Union's arguments are rejected.

Trans Union's first argument is creative, but ultimately fails. Contrary to Trans Union's argument, the use of the word "may" in the statute does not convert the entire section into a "permissive" one. Such an interpretation would in essence eliminate the need for the entire section; it would render it superfluous. At a minimum, it would nullify the phrase "limited

Because the parties' definitions overlap at least so far as recklessness is concerned, and because the court finds that there is sufficient evidence in the record to permit a legitimate inference of recklessness on the part of Trans

Union, the court concludes that for the time being at least, there is no need to resolve definitively the question of what must be shown before a defendant can be held liable for a "willful" violation of the FCRA.

to" as used in the statute; under the approach that Trans Union appears to advocate a credit reporting agency could report whatever it felt like reporting about an individual (except perhaps for physical characteristics and ethnicity), and the "limited to" language would in fact present no limitation whatsoever upon the credit reporting agency's conduct. This court finds that the use of the term "limited to" as used here must have some meaning, and the meaning it must have is, as its language suggests, one of *limitation*. And, the court finds, the limitation imposed by the "limited to" language can mean only one thing: that a credit reporting agency *may not* disclose identifying information about a consumer unless it is of the type already set forth in the section—i.e., name, address, former addresses, places of employments, and former places of employment. *See, e.g., Edgar v. Reich*, 881 F.Supp. 83, 86 (D.Mass.1995) (under section 1681f the government may obtain a report from a consumer reporting agency "if the report is *limited to* identifying information" such as "name, address, former address, places of employment, [and] former places of employment") (emphasis added); *see also In re Grand Jury Subpoena Duces Tecum*, 498 F.Supp. 1174, 1176–77 & n. 2 (N.D.Ga.1980) (citing section 1681f as an example of "Congressional concern over governmental access to consumer credit reports," and quoting legislative history for the proposition that the FCRA as enacted would require credit reporting agencies to implement procedures "guaranteeing the confidentiality of the information they collect and that no such information be released to non-creditors such as governmental investigatory agencies without the express consent of the person involved") (citations and quotations omitted).

■ As to the meaning that Trans Union appears to attribute to the term "identifying," the court is equally unpersuaded.

Trans Union appears to argue that the term should be interpreted to mean only race or physical characteristics, and perhaps also other features of the same general sort. However, it clearly means much more. Identifying means identifying. In the present context—i.e., the context of consumer credit reports—the term identifying must, *at a minimum*, be construed to include information of a personal nature which pertains or relates to a consumer's spending habits or creditworthiness, as well as other private facts relating to the person's financial situation. And, as will be seen below, the allegedly excessive disclosures of which Plaintiffs complain in this case could easily fall within this definition of the word "identifying."

■ Having determined that an excessive disclosure claim may indeed be based on a disclosure of information other than the four or five types permitted by section 1681f—i.e., the consumer's name, address, former address, place of employment, and former place of employment—the question remains: did Trans Union disclose information to the IRS other than information of these four or five types? The court finds that Trans Union did, or at least a reasonable jury could so conclude. Plaintiffs' excessive disclosure theory in this case is based in part upon a disclosure to the IRS by Trans Union of "disputed accounts other than accounts related to the disputed IRS tax liens." (Opp. at 19:15–16.) There may be some dispute based on the record as to exactly what the so-called "eight page fax" consisted of. Plaintiffs appear to contend that the facsimile consisted of the documents attached to Exhibit E of the Russ declaration, identified by numbers 120 through 128 stamped in the bottom corner of each page. (*See* Pl.'s Sep. Stmt. Undisp. Facts at 25:5–8; *see also* Opp. at 19:14.) Among these pages is Plaintiffs' two-page statement of dispute.

Trans Union has not responded to Plaintiffs' (apparent) assertion that the statement of dispute was included in the eight-page facsimile; however, Trans Union appears to assert elsewhere in its papers that the eight-page facsimile consisted of a *different* set of papers, attached as Exhibit 38 to Exhibit C to the Russ declaration. (*See* Def.'s Sep. Stmt. Undisp. Facts at 8:25.) The pages which Trans Union appears to claim made up the eight-page facsimile *do not* contain a copy of Plaintiffs' statement of dispute—although the copy of these pages which Trans Union has submitted as the chambers copy may be missing at least one page. (*See* Russ Decl. Ex. C at 11–12.) Thus, there may well be a dispute between the parties as to exactly what was disclosed to Guido in the eight-page facsimile; it is not clear whether the eight-page facsimile included Plaintiffs' statement of dispute, and the parties appear to be in disagreement on this point. However, *if* Trans Union provided Guido of the IRS a copy of Plaintiffs' statement of dispute, it will necessarily follow that personal information was disclosed. Among the accounts described in the statement of dispute were accounts with various department stores and banks, along with the account numbers for these accounts and information regarding whether they were still open or had been closed. In addition, the statement of dispute disclosed that Plaintiffs had a "substantial bank loan pending," and wanted to have the disputes cleared up so that the loan would be approved. In other words, the statement of dispute was not limited only to the identifying information set forth at section 1681f; the information just mentioned constituted private and personal credit information of Plaintiffs that should never have been disclosed to the IRS. Therefore, assuming Trans Union sent a copy of the statement of dispute to Guido of the IRS— a fact which appears to be still in dispute—a jury might well find that Trans

Union provided the government with information not specifically allowed by section 1681f.

But, as just noted, the eight-page facsimile may not have consisted—or may not have consisted entirely—of the materials just discussed. In one of her depositions in this matter, Deborah identified a copy of a *different* lien-related document that may have been part of the eight-page facsimile. The court finds that *if* it was sent to Guido, this document may also have constituted an improper excessive disclosure. Assuming that the eight-page facsimile consisted of the documents which Trans Union says it did, among these documents was a "Universal Data Form" concerning a property lien different from any of the liens mentioned so far. (*See* Russ Decl. Ex. E at 30.) This Universal Data Form is the other lien-related document referred to by Deborah in her deposition. The liens discussed so far have all been in one of three amounts: $57,178.19; $500.00; and $39,100.10. The lien which was the subject of the Universal Data Form that may have been included in the eight-page facsimile was apparently for a different debt altogether; it has a different account number, and it is in the (different) amount of just over $34,000.00. The Universal Data Form just mentioned bears a handwritten notation next the printed word "court"; the notation says, "Fresno Municipal Court," and the Universal Data Form refers to number 92177570 as the "case number" for whatever proceedings occurred in that court. Assuming the Universal Data form was in fact sent to Guido, these notations on the Universal Data Form may have created the impression that Plaintiffs were involved in some sort of litigation in the state court system when—apparently at least—they were not. The court finds that this separate alleged disclosure constitutes an independent evidentiary basis upon which Trans Union's motion for sum-

mary judgment as to Plaintiffs' section 1681f claim must be denied.

 Trans Union argues that even if Plaintiffs could prove a violation of section 1681f for excessive disclosure of personal information, they cannot ultimately prevail on this claim because they cannot prove that they suffered any damages as a result. This argument is rejected. Although it did not involve section 1681f, the Ninth Circuit's opinion in *Guimond* seems clearly contrary to this argument; the Ninth Circuit in *Guimond* stated that a plaintiff can recover damages based on an FCRA violation for, among other things, emotional distress.

In short, the court finds that it would be improper to enter judgment in favor of Trans Union on the excessive disclosure claim, and will therefore deny Trans Union's motion to this extent.[10]

## IV. "Standing"

 Trans Union's final argument is that because Deborah is Raffi's wife, and because the credit report at issue here purportedly pertained to Raffi rather than Deborah, Deborah lacks "standing" to recover in this case. Trans Union states that there is a split in the caselaw on the question of "spousal standing" under the FCRA, but argues that the better view is that there is no spousal standing in a case such as this one. The court rejects this argument for the following reasons.

First, Trans Union's argument is directly contrary to the FCRA itself, at least so far as the facts of this case are concerned. Although Trans Union argues that the credit report at issue here was Raffi's, it is clear from the evidence that it actually falls within the statutory definition of credit report as to both Raffi and Deborah. Under the FCRA, a "consumer credit report" is

> any written, oral, or other communication of *any information* by a consumer credit reporting agency *bearing on a consumer's credit worthiness*, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living *which is used or expected to be used* or collected in whole or in part *for the purpose of* serving as a factor in *establishing* the consumer's *eligibility for*
> (A) *credit* . . . .

15 U.S.C. § 1681a(d)(1) (emphasis added). So far as negligent violations of the FCRA are concerned, the FCRA creates a private

---

**10.** In making this ruling, the court need not rely (and does not rely) upon a separate alleged excessive disclosure may arguably have occurred when a Trans Union employee spoke to Guido by phone in advance of the small claims hearing mentioned earlier. This call was apparently initiated by the Trans Union employee, named Reger, who defends Trans Union in small claim court litigation.

Reger testified in deposition that the only identifying information he gave Guido regarding Plaintiffs was their names; however, he also testified that the call lasted 10 minutes. In addition, his notes indicate not that the liens were nonattached, as was apparently the case, but that they were "in dispute." Furthermore, Reger's notes indicate that Raffi's brothers were actually liable for the tax debt. Plaintiffs argue that Reger could not have

gotten this much information from Guido without disclosing more to Guido than Plaintiffs' names, current and former addresses, and current and former places of employment.

Whether Reger disclosed more than the information allowed by section 1681i(f), and whether the inference of more extensive disclosure that Plaintiffs rely on is a reasonable one, are issues the court need not resolve at this time. It is clear based on the materials already discussed that there is sufficient evidence to support Plaintiffs' section 1681i(f) theory even without consideration of the Guido–Reger conversation, and Plaintiffs must therefore be allowed to proceed to trial on their section 1681i(f) claim regardless of what was or was not said in that conversation.

right of action in favor of "any consumer" with respect to whom a credit reporting agency has failed to "comply with any requirement imposed under this subchapter." 15 U.S.C. § 1681*o*(a). In the case of willful noncompliance, the court may award relief consisting of "any actual damages sustained by the consumer as a result of the failure," or alternatively consisting of damages of "not less than $100 and not more than $1000." 15 U.S.C. §§ 1681n(a), 1681n(a)(1)(A). Punitive damages may also be imposed, along with attorney's fees if the action is successful. *See* 15 U.S.C. §§ 1681n(a)(2), (3); 15 U.S.C. § 1681*o*(a)(2).[11]

The credit report in this case, although ostensibly pertaining to Raffi only, actually contains considerable information pertaining to Deborah as well. For example, it refers to at least three accounts—a mortgage, a credit card, and an auto loan— which are, according to the credit report, "joint accounts." (Russ Decl. Ex. B at 59– 60.) These notations constitute "information [reported] by a consumer credit reporting agency bearing on a consumer's credit worthiness" which either was used or could reasonably have been expected to be used to "serv[e] as a factor in establishing [Deborah's] eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Thus, even though the credit report at issue here purports to be the credit report of Raffi, it is clear that it also qualifies under the FCRA as a credit report with respect to Deborah. Under the FCRA, then, the only question at this time is whether Deborah is a "consumer" with respect to whom Trans Union has violated "any provision of this sub-

chapter," and whether Deborah has sustained "any actual damages" as a result. 15 U.S.C. §§ 1681n(a), 1681n(a)(1)(A); *see also* 15 U.S.C. §§ 1681*o*(a), 1681*o*(a)(1). The court finds that Deborah is such a consumer who has sustained compensable damages under the FCRA, or at the very least there are genuine issues of material fact which preclude any other conclusion at this stage of the game.

There appears to be no authority from within the Ninth Circuit considering the question of whether the spouse of an individual named in a credit report may maintain an action in a situation such as this one—i.e., where the spouse seeking to maintain the action is not named in the credit report, but the credit report contains credit-related information regarding the unnamed spouse. Cases from other jurisdictions provide some guidance, however. In general, the rule announced in these cases is that "where a credit report relates to both a husband and wife, both spouses have standing to sue for damages." *Wiggins v. Equifax Serv., Inc.,* 848 F.Supp. 213, 226–27 (D.D.C.1993); *see also Washington v. CSC Credit Serv., Inc.,* 194 F.R.D. 244, 252 (E.D.La.2000) ("Mrs. Malbrough would have standing to bring such a[n FCRA claim] only if she also demonstrated that the release of information caused damage to her credit worthiness"). Under this view, Deborah clearly has standing: as already explained, the credit report at issue here appears to "relate[ ] to both a husband and wife," *Wiggins,* 848 F.Supp. at 226, and there is evidence in the record that suggests that

---

**11.** The FCRA also provides that if an unsuccessful pleading, motion, or other paper is filed "in bad faith or for purposes of harassment," the court shall award attorney's fees to the prevailing party. 15 U.S.C. § 1681(*o*)(b). The Ninth Circuit has stated generally that "only plaintiffs are entitled to recover attorneys' fees" under the FCRA. *Gui-*

*mond,* 45 F.3d at 1336. Based on the context of this statement, it is not clear whether the plaintiffs-only rule for attorney's fees was intended by the Ninth Circuit to be a general rule only, or whether it also applies to the FCRA provision quoted in this footnote for cases of bad-faith or harassing filing of unsuccessful pleadings and motions.

the contents of that report have "caused damage to [Deborah's] credit worthiness." *Washington,* 194 F.R.D. at 252. Among the evidence suggesting that the contents of the Trans Union report damaged Deborah's creditworthiness is a series of credit denial letters from the time period during which the tax liens were improperly reported, at least some of which specifically reference the tax liens as a reason for denial. (*See* Soghomonian Decl. Ex. R, S, T.) At least one such denial letter is addressed to both Deborah and Raffi. Thus, there is evidence in the record from which a reasonable jury could conclude that Deborah did indeed suffer damages due to the improper reporting of information on a credit report which was, at least in part, *her* credit report within the meaning of the FCRA.[12]

In support of its motion for summary judgment, Trans Union argues, as already noted, that there is a split of authority regarding whether a spouse may recover in cases such as this one. Trans Union asserts that the better view is that no such recovery is permitted, and that the contrary caselaw—particularly *Williams v.*

*Equifax Credit Info. Serv.,* 892 F.Supp. 951 (1995)—is "poorly reasoned." This court disagrees. For one thing, the alleged "split" in authority is not what Trans Union claims it is. Indeed, the authorities appear to be in near unanimity on the question, at least as it relates to the present case. The two main cases which Trans Union claims were correctly decided, and on which Trans Union places primary reliance in its motion, are the *Wiggins* and *Washington* cases, cited above. Yet even these cases hold that either spouse may recover "where a credit report refers and relates to both a husband and wife," and where the spouse seeking recovery has suffered "damage to [his or] her credit worthiness," respectively. 848 F.Supp. at 226–27 (citation omitted); 194 F.R.D. at 252. Furthermore, the Ninth Circuit has stated on more than one occasion that the FCRA is to be liberally construed. *See, e.g., Guimond,* 45 F.3d at 1333 (citation omitted). To deny recovery to a wife whose name does not specifically appear on a credit report but whose credit information does, and who has been injured by the incorrect reporting of information con-

---

**12.** Trans Union contends that the evidence just mentioned should be disregarded as irrelevant, and as containing inadmissible hearsay. These objections have already been overruled above with respect to Exhibit R to the Soghomonian declaration, and are overruled again so far as the other exhibits referred to above are concerned.

Trans Union also contends that even if Plaintiffs were denied some credit opportunities as a result of *somebody*'s incorrect reporting of Plaintiffs' credit information, there is no evidence that the incorrect reports were those of Trans Union, as opposed to some other credit reporting firm. Thus, Trans Union asserts that there is no *direct* evidence that Deborah suffered any harm "as a result of" its alleged violations of the FCRA, and summary judgment should be granted. This argument is rejected.

It is true that the credit denial letters do not say, "we now deny your request for credit

because of the contents of your Trans Union credit report." However, a jury could easily infer that this was the reason. The Trans Union report contained inaccuracies regarding the tax liens; the denial letters (or at least one of them) was addressed to Deborah as well as Raffi; the denial letters specifically mentioned the tax liens as a reason for denial; and the denial letters were issued during the time period in which the tax lien status was being incorrectly reported on the Trans Union credit report. In ruling on a summary judgment motion the court must draw all reasonable inferences in favor of the nonmovant—in this case Plaintiffs. *See Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted). One such inference—and a perfectly reasonable one based on the facts just discussed—is that Deborah was indeed harmed by the conduct of Trans Union as discussed herein.

tained in the credit report, would be contrary to both congressional intent and the spirit of the FCRA. This court will not indulge such an interpretation of the FCRA in the absence of some authority that so requires.

Finally, Trans Union appears to argue that even if *some* of Deborah's personal credit information appears on the report, and even if Deborah was injured by the incorrect reporting of *some information* contained in that report, Deborah cannot recover here because she cannot demonstrate that the incorrect information that injured her is the same information that pertained to her directly. In other words, as the court understands Trans Union's argument, even if the tax liens were incorrectly reported in a credit report that contained Deborah's credit information, and even if Deborah suffered damages because of the incorrect reporting of the tax liens, she still lacks standing here because the tax liens themselves were not Deborah's, but Raffi's. This argument is contrary to the liberal construction of the FCRA mandated by Ninth Circuit. It is also contrary

to the language of the FCRA itself. The FCRA imposes civil liability for negligent noncompliance with the FCRA in favor of "any consumer" who can show "any actual damages sustained by the consumer" as a result of the noncompliance. 15 U.S.C. §§ 1681*o*(a), 1681*o*(a)(1). The failure that Trans Union is accused of here consists of misreporting credit information of one of the Plaintiffs in a document that qualifies as a credit report as to both of the Plaintiffs. As long as both Plaintiffs can show that they suffered injury as a result, there is no reason under the statute why both should not be able to recover. Both qualify as "consumers" under the FCRA, and both have offered at least some evidence suggesting that they suffered damages as a result of Trans Union's failure to comply with a provision of the FCRA.[13]

## V. *Remaining Issues*

Before concluding, there are a few remaining issues that should be addressed.

■ First, it is clear that Plaintiffs main theory so far as the incorrect reporting of credit information is concerned is

---

**13.** Further statutory support for the conclusion reached in text above is found in the language of section 1681i(a)(1)(A), which imposes a duty on the consumer reporting agency to investigate the accuracy of *"any item of information* contained in a consumer's file" if the consumer "notifies the agency directly of such dispute." 15 U.S.C. § 1681i(a)(1)(A) (emphasis added). The requirement that the reporting agency reinvestigate *"any item "* found in a consumer's file—and not just those items that pertain to the consumer directly, or those debts that were incurred by the consumer making the request—is further evidence that the FCRA was intended by Congress to operate not as Trans Union claims it does, but in favor of *any* consumer whose information appears on a report, whether or not the incorrect information is the information of the complaining consumer only.

 Moreover, there is evidence in the record suggesting that even if Trans Union believed the liens pertained only to Raffi, the IRS did

not share this view, but (apparently) believed that Deborah could be depended upon as a possible source of satisfaction of the debt that the tax liens represented. Plaintiffs' currently-operative pleading (their verified first amended complaint) alleges that an IRS agent visited their home and told Deborah that the IRS would be able to collect the "entire amount[s]" represented by the IRS liens, in part because Deborah had "good future earning potential" since she was or would soon become an attorney. (First Am. Compl. at 20:4–7.) *See Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir.2000) ("[a] plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence") (citation omitted). Thus, it appears that the tax liens and the debts they represented constituted, in a very real sense, Deborah's credit information.

that Trans Union failed to correct the tax lien-related information after Plaintiffs brought Trans Union's reporting errors to its attention. The court has already ruled that this claim may proceed. However, this does not necessarily mean that Plaintiffs should be allowed to proceed on the related but slightly different theory—and perhaps more common type of FCRA violation—of failure to maintain adequate measures to ensure that only accurate information is reported in the first place. *See* 15 U.S.C. § 1681e(b). Therefore, although it is clear that Plaintiffs should be allowed to proceed to the extent that their claim is one of failure to correct after being asked to do so, it still remains for the court to decide whether the same is true of any theory of recovery that does not depend so much on the notion not that Trans Union failed to correct, but that Trans Union failed to implement procedures that would have made it unnecessary to ask for a correction. (This theory will be referred to in the following discussion as Plaintiffs' subsection e(b) theory, because it is based on 15 U.S.C. section 1681e(b).) The court concludes that although the complaint is far from clear on this point, such a claim is indeed contained therein, and to the extent that Trans Union may have requested summary judgment on this claim it must be denied. This conclusion is based both on the contents of the complaint and on the fact that Trans Union does not appear to contend otherwise.

In their opposition papers, Plaintiffs state that if "liberally construed," their complaint asserts not only the claims that have already been discussed above, but also a claim for failure to follow reasonable procedures to assure maximum accuracy in violation of 15 U.S.C. section 1681e(b). Trans Union does not appear to respond *directly* to this assertion in its reply papers; it does, however, refer to subsection e(b) at one point as the "source of the key

statutory duty at issue in this litigation." (Reply at 18:12–13.) Thus, it appears that Trans Union does not dispute that Plaintiffs have alleged a subsection e(b) claim in this case. Neither Trans Union nor Plaintiffs have addressed the state of evidence as it might relate to Plaintiffs' subsection e(b) claim—assuming one exists—in anything more than the most cursory fashion. Thus, the court must conclude that Plaintiffs' subsection e(b) "reasonable procedures" claim—the existence of which Trans Union itself does not appear to challenge—must be allowed to proceed to trial. This is the first reason for the court to conclude that a subsection e(b) claim does indeed exist, and for the court to deny summary judgment on this claim.

The second reason for the court to conclude that a subsection e(b) claim is set forth in the complaint is the complaint itself. The complaint alleges that

[a]s a result of how the credit reporting agencies reported the liens, Raffi Soghomonian and Deborah Garabedian were not previously aware that the May 16, 1995 liens were the source of their constant credit reporting and related problems because the credit reporting agencies do not list sufficient information to have singled out the May 16, 1995 series as the cause [of Plaintiffs' credit problems]. Specifically, the credit reports which were provided by Trans Union listed the March, 1995 series which were supposedly effectively non-attached; of course, the credit reporting agencies eventually claimed otherwise, holding the position that what they reported was accurate.

(First Am. Compl. at 46:20–47:3.) Later, the complaint alleges that although Trans Union "claims it has followed correct reporting procedures regarding insuring the accuracy of the reports ... in fact, the reports are highly inaccurate [and Trans

Union is] still incorrectly reporting." (*Id.* at 48:5–8.) Although these allegations are not made in the portion of the complaint that contains the eighth claim for relief against Trans Union, the eighth claim, like all the others, specifically incorporates all prior paragraphs. Under the notice pleading rules used in federal court, all that is required to state a claim for relief is that "the averments of the complaint sufficiently establish a basis for judgment against the defendant." *AlliedSignal, Inc. v. City of Phoenix,* 182 F.3d 692, 696 (9th Cir. 1999) (citation and quotations omitted). Fairly read, and when viewed in light of the other allegations, the language of the complaint quoted above is sufficient to have put Trans Union on notice that Plaintiffs sought recovery for failure to follow reasonable procedures to assure maximum accuracy, in violation of subsection e(b). If

nothing else, it should have suggested that (1) the tax liens as reported before the submission of Plaintiffs' statement of dispute was not reasonably accurate, because it failed to identify the proper series of liens; and (2) this lack of reasonable accuracy was due to Trans Union's failure to utilize adequate procedures to ensure that its reports were as accurate as they reasonably could be—although Trans Union would eventually contend that the report had been accurate all along. Thus, the court concludes that Plaintiffs have adequately alleged a subsection e(b) violation. Because the parties have failed to address the state of the evidence with respect to such a claim in connection with the present motion, summary judgment on this claim must be denied.[14]

 Next, there is the question of the status of Plaintiffs' apparent "permissible

---

**14.** Even if the parties had addressed the subsection e(b)-related issues in a more comprehensive manner, and these issues were therefore more sharply focused for the court's consideration, the court would still conclude based on the evidence that summary judgment should not be granted as to this claim.

The Ninth Circuit follows a burden-shifting approach in determining the propriety of granting summary judgment on a subsection e(b) claim. First, the plaintiff must make out a prima facie case. This is done by offering evidence "tending to show that [the] credit reporting agency prepared a report containing inaccurate information." *Guimond,* 45 F.3d at 1333 (citation omitted). Once this initial burden is met, it becomes the defendant's duty to "establish[ ] that an inaccurate report was generated despite the agency's following reasonable procedures." *Id.* If the defendant can meet this burden, the defendant escapes liability. However, as observed earlier, in "the overwhelming majority of cases" the reasonableness of a credit reporting agency's procedures, along with the question of whether the agency actually followed such procedures (if they did in fact exist), are jury questions. *Id.* (citation omitted).

Here, Trans Union appears to contend that the procedure it used to avoid the appearance

of inaccurate information consisted of contracting with Hogan, a "third party vendor" responsible for collecting public record information for the geographic area which includes Plaintiffs' place of residence. But it is not at all clear from the record that this "procedure"—which may, based on the evidence, have consisted of nothing more than a wholesale abdication to Hogan of the duty to act reasonably—was at all reasonable. For example, it appears to be undisputed that Hogan *does not* check for CNAs when it investigates the status of a consumer's tax lien, or at least that it did not check for CNAs prior to the commencement of this litigation. This is sufficient to preclude a finding by this court that Trans Union acted reasonably as a matter of law in obtaining and reporting the information contained in Plaintiffs' credit report, especially in light of the Ninth Circuit's clear mandate that the district courts must allow the question of reasonableness to be decided by juries in the "overwhelming majority of cases." In short, Trans Union has offered nothing which would persuade this court that the current case falls outside of the "overwhelming majority" in which the plaintiff should be allowed to have the reasonableness issue decided by a jury. For this additional reason, summary judgment as to Plaintiffs' subsection e(b) claim must be denied.

purpose" claim, if such a claim exists. In a footnote in its reply brief, Trans Union asserts that Plaintiffs have now claimed, apparently for the first time, that the eight-page facsimile constituted an improper disclosure of a consumer report for a purpose other than a "permissible purpose" in violation of the FCRA. *See generally* 15 U.S.C. § 1681b(a). As with the subsection e(b) issue, discussed immediately above, the court must first determine whether such a claim is in fact alleged in the complaint. If it is, the court must then decide whether summary judgment should be granted on this claim. Unlike the subsection e(b) claim discussed in the previous paragraph, however, the court finds that Plaintiffs have not pleaded a "permissible purpose" violation in this case.

The complaint clearly alleges the improper disclosure by Trans Union of information other than allowable "identifying information" to a government agency—in this case the IRS. 15 U.S.C. § 1681f. However, the complaint cannot be interpreted to assert a claim based on the sometimes-related "permissible purpose" theory of recovery—which could probably more accurately be described, at least in the present case, as the impermissible purpose theory. *See* 15 U.S.C. § 1681b.[15] The "permissible purpose" language of the FCRA, and its prohibition against furnishing credit reports for an impermissible purpose, is different from the section 1681f "excessive disclosure" rule in the following way: section 1681f concerns *any identifying information* (other than the consumer's name, address, and similar information), while section 1681b only prohibits the improper furnishing of a credit report.

*See generally* 15 U.S.C. § 1681b(a). Here, as already noted, Plaintiffs allege that Trans Union improperly disclosed identifying information to the IRS, but their complaint *does not* allege that Trans Union furnished a credit report to the IRS. Plaintiffs allege that after they sued Trans Union in small claims court, Trans Union "sent information about an erroneous $10.00 Fresno County Revenue debt to the IRS; and, for reasons still unknown, with Fresno County Municipal Court as an identifying factor." (First Am. Compl. at 47:15–18 (citation omitted).) This allegation of disclosure to the IRS of the information related to the Fresno court appears to be a reference to the Universal Data Form, mentioned above, that may have been sent as part of the "eight page fax" to Guido of the IRS. This disclosure might appear at first glance to constitute a credit report as defined in the FCRA; the FCRA defines a credit report *in part* as any communication, written or oral, which "bear[s] on a consumer's credit worthiness, credit standing, credit capacity, character ... [or] personal characteristics." 15 U.S.C. § 1681a(d)(1). A Universal Data Form suggesting that a consumer has an unpaid debt incurred in connection with a court proceeding certainly qualifies as a communication "bearing on a consumer's credit worthiness." However, the FCRA definition of credit report goes on to state that the communication which constitutes the credit report must be "used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" credit, insurance, employment, or other permitted purposes.

---

**15.** The reason these two theories are sometimes related is that an excessive disclosure to the government of identifying information is, by definition, impermissible. Thus, there are no doubt cases in which an excessive disclosure of personal information may also qualify as a disclosure of a credit report that is not

for a permissible purpose under section 1681b. However, as will be explained above in text, not every excessive disclosure constitutes a section 1681b impermissible purpose offense, because not every such disclosure constitutes a disclosure of a credit report.

15 U.S.C. § 1681a(d)(1). Here, the complaint *does not* allege that the Universal Data Form disclosure of the municipal court-related debt was intended to be used in determining whether Plaintiffs qualified for credit or insurance; instead, it was used for the purpose of "verify[ing] the disputed information" on Plaintiffs' credit report. (First Am. Compl. at 47:13–14.) Thus, the alleged disclosure of the municipal court-related debt was not a disclosure of a credit report at all; what was disclosed did not constitute a credit report in light of the *purpose* for which the alleged disclosure was made—i.e., to verify the disputed contents of Plaintiffs' credit report.

Plaintiffs now argue that the purpose of the disclosure was not to aid in the verification of the disputed debts, but to assist Trans Union in preparing for the small claims court hearing. However, this theory was not alleged in the complaint. If Plaintiffs wished to proceed on such a theory, they should have sought leave to amend their complaint. However, they have not done so—at least not so far as any section 1681b theory is concerned—and the court therefore concludes that there is no such theory of recovery currently at issue in this case.[16]

The third remaining issue that must be considered at this time is this: in their eighth claim for relief, Plaintiffs state that

[i]n the event that it is determined that Trans Union's conduct was not willful, Raffi Soghomonian and Deborah Garabedian would alternatively plead supplemental jurisdiction to recover pain and suffering as part of their actual damages, as permitted under California

Civil Code, Section 1785.31, if not otherwise available under 15 U.S.C. 1681, *et seq.*

(First Am. Compl. at 78:14–20 (underscoring added).) Plaintiffs' mention of section 1785.31 is presumably a reference to California's Consumer Credit Reporting Agencies Act ("CCRAA"), California Civil Code section 1875.1 *et seq.* The CCRAA provides remedies to consumers who are victims of improper credit reporting; these remedies are, in many respects at least, similar to those available under the FCRA. *See Guimond,* 45 F.3d at 1335. Thus, Plaintiffs perhaps could have pleaded a CCRAA claim for relief if they had chosen to do so. In this case, however, the court has concluded that there is sufficient evidence in the record to allow Plaintiffs to proceed to trial on their FCRA willful violation theory. Because the complaint only seeks to assert a claim under the CCRAA if it is determined that Trans Union's conduct "was not willful," and because the court has concluded that Trans Union's conduct in this case may well have been willful, the court finds that there is no CCRAA claim upon which Plaintiffs may proceed to trial.[17]

Finally, the court notes that Plaintiffs' opposition papers assert that Trans Union failed to "flag [a] disputed item of information in [their] credit report" in violation of a provision of the FCRA they describe as section "1681(c)." In fact, there is no section 1681(c). The section that Plaintiffs probably intend to cite is 1681c, which states (as a relevant here) that "[if] a consumer reporting agency is notified pursuant to section 1681s–2(a)(3) of this title that information regarding a consumer

---

**16.** By this order the court does not express any opinion on the likely outcome of such a motion to amend if one had been made, nor does the court mean to suggest that such a motion, if Plaintiffs were to make one now, would necessarily succeed.

**17.** In addition, the court notes that the parties have made no arguments whatsoever with respect to the possibility of a CCRAA claim. They simply have not addressed the merits of this claim, even assuming that it exists.

[that] was furnished to that agency is disputed by the consumer, the agency shall indicate that fact in each consumer report that includes the disputed information." 15 U.S.C. § 1681c(f). Section 1681s–2(a)(3), in turn, refers to situations in which a consumer disputes some information contained in the consumer's credit report not with the credit reporting agency but with "any person" who provides information to the credit reporting agency. 15 U.S.C. § 1681s–2(a)(3). In other words, sections 1681c(f) and 1681s–2(a)(3), when read together, require that a *provider* of information to a credit reporting agency—probably the creditor itself in most cases—must notify the agency when it receives from the consumer a statement that the information is in dispute, and the credit reporting agency cannot thereafter report the information without also reporting the existence of the dispute. Here, of course, the source of the disputed information was the IRS. (Later it may have been Hogan, but there is no allegation in the complaint that Plaintiffs complained *to Hogan,* as opposed to Trans Union; the allegation is that Plaintiffs complained to Trans Union and Trans Union failed to take proper action.) However, Plaintiffs do not allege that Trans Union failed to take proper action *after being notified by the IRS* of the existence of the tax lien dispute. Instead, Plaintiffs allege that Trans Union failed to take proper action after being notified *by Plaintiffs* that the tax liens were disputed. Thus, it can be seen that subsection 1681c(f)—*if* this is the section Plaintiffs mean to rely on, a fact which is by no means entirely clear—does not apply to the present case. The court accordingly concludes that Plaintiffs may not proceed to trial on any such theory.

## CONCLUSION

For the reasons set forth above,

(1) Trans Union's motion for summary judgment IS HEREBY DENIED in its entirety;

(2) notwithstanding the foregoing, Plaintiffs may not proceed to trial on any theory based on 15 U.S.C. section 1681c(f), or on the California Consumer Credit Reporting Agencies Act;

(3) Plaintiffs may not proceed to trial on any "permissible purpose" theory under 15 U.S.C. section 1681b(a); and

(4) in light of this court's July 23, 2003, order vacating certain dates in this matter, Trans Union's motion to continue the trial IS HEREBY DENIED AS MOOT.

IT IS SO ORDERED.